FILED IN OPEN COURT

JUN 2 2 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 1:12-CR-37 |
| | ) |
| AMINE MOHAMED EL-KHALIFI, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

Were this matter to go to trial, the United States of America would prove the following facts beyond a reasonable doubt:

1. From on or about December 1, 2011, and continuing through on or about February 17, 2012, in the Eastern District of Virginia and elsewhere, defendant AMINE MOHAMED EL-KHALIFI did knowingly and unlawfully attempt to use a weapon of mass destruction, that is, a destructive device consisting of an improvised explosive device, against property that is owned and used by the United States, namely the United States Capitol Building, in Washington, D.C., and against persons and property within the United States, and a facility of interstate commerce was used in furtherance of the offense, the property is used in interstate and foreign commerce and in an activity that affects interstate and foreign commerce, a perpetrator traveled in interstate commerce in furtherance of the offense, and the results of the offense would have affected interstate and foreign commerce.

In order to attempt to use a weapon of mass destruction against the United States Capitol Building, EL-KHALIFI took the following actions, among others:

2. On or about December 1, 2011, EL-KHALIFI traveled with an individual known to him as "Hussien" from Alexandria, Virginia, to Baltimore, Maryland, to meet an individual introduced to him as "Yusuf." In fact, Yusuf was a law enforcement officer acting in an undercover capacity. EL-KHALIFI believed Yusuf to be associated with an armed extremist group and EL-KHALIFI asked to be associated with that group. EL-KHALIFI told Yusuf that EL-KHALIFI had a plan to explode a bomb at an office building in the City of Alexandria containing offices occupied by the U.S. military, but that EL-KHALIFI was unsure about carrying out the plan because the military occupied only a part of the building. EL-KHALIFI handled an AK-47 rifle belonging to Yusuf, and told Yusuf that EL-KHALIFI wanted to conduct an operation in which he would use a gun and kill people face to face.

3. On or about December 8, 2011, in the City of Alexandria, EL-KHALIFI told Hussien that EL-KHALIFI wanted to attack a synagogue. After Hussien questioned the justification for targeting civilians, EL-KHALIFI suggested that they target an Army general. EL-KHALIFI told Hussien that EL-KHALIFI could research where Army generals live. EL-KHALIFI agreed that Yusuf could be told of his plans.

4. On or about December 15, 2011, in the City of Alexandria, EL-KHALIFI told Hussien that EL-KHALIFI had found a government building and could find out from a friend when high-ranking military officials were present at that location. EL-KHALIFI said that he wanted to place a bomb in a restaurant that was located next to the building because it was frequented by military officials. EL-KHALIFI also said that he and Hussien should go to the restaurant the following week to conduct surveillance. EL-KHALIFI did not identify to Hussien either the particular building or restaurant.

5. On or about December 22, 2011, EL-KHALIFI met with Hussien at EL-KHALIFI's residence in Alexandria, Virginia, and identified to Hussien the restaurant in Washington, D.C., in which EL-KHALIFI wanted to plant and detonate a bomb. EL-KHALIFI then traveled with Hussien to Washington, D.C., to surveil the restaurant in preparation for his planned bombing of that restaurant. EL-KHALIFI told Hussien that he wanted to leave a bomb in his jacket behind a chair at the restaurant. EL-KHALIFI entered the restaurant and questioned a waiter at the restaurant as to its busiest time. Upon learning that the restaurant was busiest at lunchtime, EL-KHALIFI indicated to Hussien that he planned to detonate the bomb at lunchtime.

6. A cast booster is a stable high explosive that when combined with a detonation source can be used as a destructive device. On or about January 7, 2012, at his apartment in the City of Alexandria, EL-KHALIFI handled a cast booster provided by Hussien as an example of an explosive that could be used at the restaurant in Washington, D.C. Hussien represented to EL-KHALIFI that he was an al-Qaeda operative. EL-KHALIFI and Hussien discussed the possibility that EL-KHALIFI's planned bombing of the restaurant would be followed by a second attack against a military installation to be conducted by others whom EL-KHALIFI believed to be associated with Hussien. It was EL-KHALIFI's understanding that his attack on the restaurant would be part of a terrorist operation that would include both his restaurant bombing and the attack against a military installation. EL-KHALIFI agreed to purchase nails, glue, and cell phones for use in what he believed to be a terrorist attack.

7. On or about January 8, 2012, EL-KHALIFI purchased two jackets and a cell phone in and around Alexandria, Virginia. EL-KHALIFI agreed to purchase two more cell phones, nails, and glue. These items were for use in terrorist attacks.

8.      On or about January 15, 2012, EL-KHALIFI and Hussien drove to a quarry in West Virginia to meet Yusuf. Before leaving the City of Alexandria, EL-KHALIFI purchased nails at a hardware store. During the drive to the quarry, EL-KHALIFI told Hussien that EL-KHALIFI had modified his plans for his attack. EL-KHALIFI stated that, rather than leaving a bomb in a restaurant, he wanted to conduct a suicide/martyrdom operation in which he would blow himself up in the United States Capitol Building in Washington, D.C. EL-KHALIFI told Hussien not to question his desire to do the attack. EL-KHALIFI said that he would be happy killing 30 people.

9.      On or about January 15, 2012, at the quarry in West Virginia, EL-KHALIFI provided to Yusuf for use in what he believed to be the terrorist attack against a military installation glue, cell phones, and nails he purchased from the hardware store, along with the other components of an improvised explosive device that he received from Hussien. EL-KHALIFI handled the component parts of a destructive device and tried on a jacket containing an inert improvised explosive device that was provided to him by Yusuf. EL-KHALIFI dialed a cell phone number that he believed would detonate a bomb placed in the quarry to see what the explosion would look like from a device similar to that which he planned to detonate at the United States Capitol Building. The test bomb detonated, and EL-KHALIFI expressed a desire for a larger explosion in his attack.

10.     On or about January 15, 2012, on the drive home from the quarry in West Virginia to the City of Alexandria, EL-KHALIFI asked Hussien to relay to Yusuf that he wanted February 17, 2012, to be the date of his martyrdom operation at the United States Capitol Building.

11. On or about January 18, 2012, EL-KHALIFI told Hussien that he wanted a bigger bomb to do more damage, and asked if the explosives he intended to use could destroy the entire building. Additionally, EL-KHALIFI reiterated his intention to die in the attack.

12. On or about January 28, 2012, EL-KHALIFI and Hussien drove from the City of Alexandria to surveil the United States Capitol Building in Washington, D.C. While driving by the building, EL-KHALIFI chose a location where he could be dropped off to enter the building for his martyrdom operation, and they discussed the specific time that he wanted to conduct the attack. EL-KHALIFI also asked for even more explosives to tape to his body for his martyrdom operation. EL-KHALIFI discussed how to enter the United States Capitol Building that he believed would not attract attention from law enforcement and discussed how he would react if he were to be approached by police officers before reaching the Capitol Building. EL-KHALIFI said that he had decided not make a martyrdom video because he did not want people to know who conducted the attack at the United States Capitol Building.

13. On or about February 6, 2012, EL-KHALIFI and Hussien drove from EL-KHALIFI's residence in the City of Alexandria to the United States Capitol Building in Washington, D.C. EL-KHALIFI exited the vehicle to conduct surveillance on the Capitol, and walked around the west and south sides of the Capitol. Upon returning to the vehicle, EL-KHALIFI discussed security at the Capitol, and asked Hussien to remotely detonate the bomb he (EL-KHALIFI) would be wearing on the day of the attack if EL-KHALIFI encountered problems with security officers. EL-KHALIFI also asked Hussien to provide him with a gun that he could use during the attack to shoot any officers who might attempt to stop him.

14. On or about February 12, 2012, EL-KHALIFI and Hussien met to discuss EL-

5

KHALIFI's plan to commit a suicide bombing at the United States Capitol Building. EL-KHALIFI expressed concern over resistance from police officers and asked Hussien about the type of gun Hussien would give him for use in his attack. EL-KHALIFI asked Hussien to send an associate to conduct additional surveillance of the United States Capitol Building to identify the best place to enter the building. EL-KHALIFI also discussed what he believed to be the associated terrorist attack on a military installation. EL-KHALIFI planned to meet on February 14, 2012, with Hussien and Yusuf to receive final training on detonating the bomb he planned to bring into the Capitol and use in his suicide bombing.

15. On or about February 14, 2012, EL-KHALIFI traveled with Hussien to a hotel room in Alexandria, Virginia, to meet with Yusuf. Hussein and EL-KHALIFI again discussed what he believed to be the terrorist attack on a military installation. When Hussien told EL-KHALIFI that Al-Zawahiri intended to release a statement regarding both EL-KHALIFI's attack on the Capitol and what he (EL-KHALIFI) believed to be the other terrorist attack on a military installation, EL-KHALIFI asked that he be referred to in the statement only as "al maghrabi." Once in the hotel room, Yusuf gave EL-KHALIFI a MAC-10 automatic weapon, which unbeknownst to EL-KHALIFI was inoperable. EL-KHALIFI carried this firearm around the hotel room, looked in the mirror at himself brandishing the firearm, and practiced pulling the trigger to fire the weapon. Yusuf also showed EL-KHALIFI a jacket that contained a combination of inert materials and component parts that could be readily assembled into a destructive device. EL-KHALIFI put on the jacket - which he believed to contain a bomb - and practiced drawing the firearm while wearing the jacket. EL-KHALIFI also practiced the operation of the detonation mechanism via cell phone. EL-KHALIFI discussed the door he

intended to use to enter the United States Capitol. EL-KHALIFI and Hussein discussed how EL-KHALIFI would shoot the police officer stationed at the door in order to ensure that he would be able to detonate the bomb inside of the building.

16. On or about February 17, 2012, EL-KHALIFI was picked up in Northern Virginia and entered a van with Hussien and Yusuf. The vest containing what EL-KHALIFI believed to be a functioning bomb and the MAC-10 automatic weapon that he had requested were in the vehicle. EL-KHALIFI, Hussien and Yusuf proceeded from Northern Virginia to a parking garage located in close proximity to the United States Capitol. EL-KHALIFI took possession of the MAC-10 automatic weapon and put on the vest containing what EL-KHALIFI believed to be a functioning bomb. Unbeknownst to EL-KHALIFI, both the weapon and the bomb had been rendered inoperable by law enforcement. EL-KHALIFI told Hussien and Yusuf that he intended to use the MAC-10 automatic weapon to shoot people before detonating the bomb. EL-KHALIFI walked alone from the vehicle toward the United States Capitol, where he intended to shoot people and detonate the bomb. EL-KHALIFI was arrested and taken into custody before exiting the parking garage.

17. The acts described above were done willfully and knowingly and with the specific intent to violate the law, and not by accident, mistake, inadvertence, or other innocent reason.

18. Should the defendant cause the plea agreement not to be accepted by a court, the Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against the defendant. Moreover, should the defendant cause the plea agreement not to be accepted by a court, the defendant waives any rights that the defendant may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal

statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding. Should a court not accept the plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)1(C), this paragraph shall not apply.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: *[signature]*

Michael P. Ben'Ary
Gordon D. Kromberg
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, AMINE MOHAMED EL-KHALIFI, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
AMINE MOHAMED EL-KHALIFI

We are AMINE MOHAMED EL-KHALIFI's attorneys. We each have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____ 6-20-12
Kenneth Troccoli
Attorney for AMINE MOHAMED EL-KHALIFI

_____ 6-20-12
Joshua Paulson
Attorney for AMINE MOHAMED EL-KHALIFI

9