IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:12-CR-37 |
| | ) | Hon. James C. Cacheris |
| AMINE MOHAMED EL-KHALIFI, | ) | Sentencing Date: Sept. 14, 2012 |
| | ) | |
| Defendant | ) | |

## DEFENDANT'S POSITION WITH REGARD TO SENTENCING FACTORS

Amine El-Khalifi stands before the Court having admitted that he attempted to detonate at the U.S. Capitol a bomb strapped to his body.  He has further admitted that his punishment should be no less than twenty-five (25) years in prison.  The question before the Court is whether such a lengthy term is sufficient punishment.  For the reasons stated below, Mr. El-Khalifi believes that it is *more* than sufficient, and that the government's recommendation for a thirty (30) year term is unwarranted.

Mr. El-Khalifi bears no ill-will against the American people.  He is relieved that his attempted crime was foiled and that no one was actually injured.  As described below, Mr. El-Khalifi's motivation for committing the offense was his belief that God had called upon him to do so.  However, he also was enabled by the FBI, who, as part of its "sting," helped Mr. El-Khalifi with the means, method and motivation for the attack.  This included monetary incentives (paying his debts and promising "martyrdom payments" to his parents), the provision of weapons and explosives with training on how to use them, logistical advice, and religious reinforcement by a cadre of (supposed) like-minded

Islamists.

Although these manipulative tactics do not constitute entrapment, they do, in combination with other factors discussed below, provide support for a sentence not in excess of 25 years. Additionally, such a lengthy term is sufficient for specific and general deterrence and to protect the public, especially given Mr. El-Khalifi's background, the paucity of his criminal record, and the fact that he will be deported to Morocco after service of his sentence.[1] A comparison of comparable cases likewise provides support for a 25-year term. Mr. El-Khalifi respectfully asks the Court to consider all of these factors and impose a just sentence in this case.

## CORRECTIONS AND OBJECTIONS TO THE PSR

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure and Section 6A1.3 of the Federal Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), Mr. El-Khalifi states that he has received and reviewed the Presentence Investigation Report ("PSR") prepared in this case and states that he has no corrections to the Guidelines calculations. As for the facts, he asks the Court to add to the employment section of the PSR the following additional information:[2]

---

[1]     As part of his Plea Agreement, Mr. El-Khalifi has agreed to entry of a stipulated order of removal. Plea Agmt. ¶ 10.

[2]     The Probation Officer has already agreed to add this additional information to the PSR. It is included here so that the Court can be made aware of it.

2

Since moving to Arlington, Virginia in mid-2000, Mr. El-Khalifi has held the following jobs (in chronological order) in the D.C. metropolitan area:

1.  Cook in a sandwich shop for approximately three months.
2.  Busboy at a club in D.C. for approximately two months.
3.  Salesman at Millennium clothing store in Georgetown, where he worked off and on for approximately three years.
4.  Waiter at a TGIF restaurant for approximately six months.
5.  Mixing and producing club music.
6.  Salesman at a clothing store (Ricardi's) in D.C. for approximately four months.
7.  Helper for a glass (doors and windows) contractor for approximately five months.
8.  Helping with car sales as reported in ¶ 44 of the PSR.

_____        _____        _____        _____

Although the Guidelines recommend a sentence of life imprisonment (offense level 51 at criminal history category VI[3]), this recommendation should not be followed in this case.  First, as discussed more fully below, sentences for comparable cases rarely fall within the Guidelines range.  Second, Mr. El-Khalifi's guilty plea was entered pursuant to 11(c)(1)(C) of the Federal Rules of Criminal Procedure with the agreement that the Guidelines range should not be followed in this case.  Instead, both sides agree that a term of imprisonment of  between 25 and 30 years is sufficient to satisfy the sentencing statute. Plea Agmt. ¶ 5.  Thus, imposing a Guidelines sentence would necessitate rejecting the Plea Agreement and allowing Mr. El-Khalifi an opportunity to withdraw his guilty plea. *See* Fed. R. Crim. P. 11(c)(5).  Finally, consideration of the other sentencing factors

---

[3]      Mr. El-Khalifi's actual CHC is I, but the terrorism enhancement under U.S.S.G. § 3A1.4 artificially raises it to VI.

supports a non-Guidelines sentence, and indeed, supports a sentence of no more than 25 years of imprisonment. These factors are addressed below.

## ARGUMENT

On June 22, 2012, Mr. El-Khalifi entered a guilty plea to one count of attempted use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a). The maximum penalties for this offense are a term of life imprisonment, a fine of $250,000, and supervised release for life. As noted, the binding plea agreement recommends a sentence within a range of 25 to 30 years of imprisonment. Mr. El-Khalifi asks the Court to accept the plea agreement and sentence him within this range. However, for the reasons stated below, Mr. El-Khalifi believes that a sentence at the low-end of this range (25 years) is sufficient but not greater than necessary to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I.    The Sentencing Factors

The overriding principle and basic mandate of § 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing: retribution, deterrence, incapacitation, and rehabilitation. Among the factors district courts should consider are: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory Guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to: reflect the

seriousness of the offense, promote respect for the law and just punishment for the offense, provide adequate deterrence, protect the public from future crimes, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  18 U.S.C. § 3553(a).

Upon consideration of these factors, a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless."  *Rita v. United States*, 551 U.S. 338, 351 (2007).  While a district court must begin its analysis by correctly calculating the advisory sentencing range, it is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence.  As such, a sentencing court is free to disagree, based on the other § 3553(a) sentencing factors, with the Guidelines' "rough approximation" of the appropriate sentence for any given case.  *Id.* at 350.

Not only are the Guidelines not mandatory on sentencing courts, they are also "not to be *presumed* reasonable."  *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (per curiam) (emphasis in original).  In other words, a sentencing court commits legal error by treating the Guidelines range as a default sentence and presuming that the sentence should come from the Guidelines.  *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010).  Rather, the Guidelines are simply an advisory tool to be considered alongside other (co-equal) statutory considerations spelled out in § 3553(a).  *Kimbrough v. United*

*States*, 552 U.S. 85, 91 (2007); *United States v. Booker*, 543 U.S. 220, 259–60 (2005).

Here, the § 3553(a) factors support a sentence of no more than 25 years of imprisonment.

## II.    Mr. El-Khalifi's Background and Character

Mr. El-Khalifi is a twenty-nine year old citizen of Morocco who was raised, along with his two younger siblings, in Casablanca, by his parents Driss and Rabiaa El-Khalifi. PSR ¶ 31.  His father is now retired but at one time owned a bazaar in Casablanca where he sold antiques, clothing, and other merchandise.  *Id*.  His mother stayed home to care for the children, and of the two parents, she was more inclined to impose discipline and insist upon strict observance of Islam.

For much of Mr. El-Khalifi's youth, his family was financially secure.  His father's business was profitable, even to the point that the family could afford to send Mr. El-Khalifi to a private school (El-Manal School), which he attended through the tenth grade. His family also could afford to let Mr. El-Khalifi travel, which is how in June 1999, at the age of sixteen, he and his father came to the United States.  *Id*. at ¶ 32.  They legally traveled on tourist visas to Kissimmee, Florida to visit an uncle (on his mother's side), who was a U.S. citizen residing there with a wife and three children.  *Id*.[4]  While here,

---

[4]     As the PSR notes in paragraph 32, Mr. El-Khalifi is in "overstay" status as his tourist visa has long since expired.  As a juvenile living in Florida, Mr. El-Khalifi believed that his uncle would apply on his behalf for lawful status and eventually citizenship, but that never occurred.

Mr. El-Khalifi became enamored with America, so much so that, after several months of

residing in Florida, he persuaded his father to return to Morocco and leave him behind in

the care of his uncle.  *Id.*

After his father's departure, Mr. El-Khalifi enrolled in Osceola High School in

Kissimmee as an eleventh grader.  *Id.* at 42.  While Mr. El-Khalifi enjoyed living with his

uncle and cousins, he did not enjoy high school.  He did not speak English well, was an

ethnic minority, and had difficulty fitting in with his peers.  He also longed to reside and

work in a more urban setting, so, at the end of 1999, and with his father's consent, he

withdrew from school and moved in with a cousin residing in Arlington, Virginia.  *Id*. at

32, 42.

Mr. El-Khalifi and his cousin resided together for several years and during that

time, Mr. El-Khalifi focused on obtaining employment and developing a career, which

was difficult with his limited formal education and in the absence of a work permit.

While steady, meaningful work was hard to find, he did, at various times and for various

periods, find work as a cook, busboy, salesman at clothing stores, waiter, and contractor's

helper.  PSR ¶¶ 43-45.  His most steady employment was for a clothing store called

Millennium in Georgetown, where he worked as a salesman for several years.  *Id*. at 45.

In addition, for approximately six years, he mixed and produced music.  *Id*.  This self-

employed enterprise brought him into many clubs and bars where he sold and

occasionally played his music.  It was also at this time that he became a frequent user of

marijuana, ecstasy, and cocaine, PSR ¶ 41, all of which were a part of the D.C. club scene.  It was these excesses that led Mr. El-Khalifi down the path toward fundamentalist Islam.

In June 2007, while at a D.C. nightclub, Mr. El-Khalifi got into an argument with an acquaintance which led to his arrest for two counts of simple assault caused by fragments from a glass which had hit the floor.  PSR ¶ 16.  Mr. El-Khalifi pled guilty to these misdemeanor charges[5] and received a five-day jail sentence and probation, which he successfully completed.  This incident, however, was a turning point in Mr. El-Khalifi's life for it led him to deeply reexamine his lifestyle and the direction his life was taking.  He spoke with his mother who urged him to read the "Noble Koran" and rediscover his faith.  Mr. El-Khalifi did so, embarking on a self-taught course of study of the Koran and Islam, to include videos that depicted the suffering of the Palestinian people and Muslims around the world.

In addition to his religious studies, Mr. El-Khalifi also changed his lifestyle.  He stopped going to bars, drinking alcohol, using cocaine and ecstasy, and spending money on flashy clothing and accessories.  He started to attend a mosque regularly.  He also began to pay more attention to his perceived obligations as a devout Muslim, particularly as they pertained to his family in Morocco.  Since Mr. El-Khalifi's arrival in the United

---

[5]     These are the only scoreable convictions that Mr. El-Khalifi has incurred.  PSR at Wrkst C.

States, his family's fortunes in Morocco had changed for the worse.  Due in part to the deteriorating economy, his father's bazaar had closed down, leaving his parents without a reliable source of income.  PSR ¶ 33.  As the eldest son, Mr. El-Khalifi felt obligated to help his family, so he endeavored to send them money as often as he could, not only for their well-being, but also for his siblings, one of whom (his sister) was still a minor living at home.  *See* Letter from Saad El-Khalifi (younger brother) attached as Exhibit 1 (confirming that their parents' worsening financial situation effected Mr. El-Khalifi deeply and noting that on multiple occasions, "Amine had $150 in his pocket only and he would send it all to our parents while he was starving").

Mr. El-Khalifi also felt obligated to help right perceived wrongs inflicted against the larger Muslim community.  Over time, he began to consider whether this obligation required him to take concrete action against the perceived transgressors of these wrongs, to include Israel, the armed forces of the United States, and the United States government. Fanning these flames were videos on the internet depicting atrocities against Muslims overseas which, together with his self-taught knowledge of the Koran, convinced Mr. El-Khalifi that he had a religious duty to take some action.  Initially, Mr. El-Khalifi's thoughts were of fighting for the Muslim cause overseas, but later, and after meeting the two undercover FBI agents ("Hussien" and "Yusuf"), he turned his thoughts to the U.S., and eventually the United States Capitol.

9

III.    **The Offense Conduct Does Not Warrant a Sentence Greater Than 25 Years of Imprisonment.**

Mr. El-Khalifi's attempt to bomb the Capitol was borne of his love for God and his sincere belief that God called him to act.  He acted without malice or hatred toward the United States - indeed for his actions to be found acceptable to God, he needed to act without any negative emotion at all.  He bore no ill will against the American people and he did not want to harm innocent civilians.  The call from God did not require that Mr. El-Khalifi succeed in his task, only that the attempt be made, for God requires nothing more.  Thus, Mr. El-Khalifi is relieved and pleased that he was prevented from actually conducting an attack.  He is even more pleased that no one was ever actually harmed or *even at risk of harm* because of his actions.

Although the offense conduct is adequately detailed in the PSR, in order to provide greater context to that conduct, it is worth reviewing certain aspects of what Mr. El-Khalifi actually did.  It is also worth reviewing the tactics employed by the FBI because, although legitimate, they affected Mr. El-Khalifi's decision-making.  Among other things, those tactics included the formation of a small, insular group of like-minded Islamists (or so Mr. El-Khalifi thought) acting in service of one of the most powerful of all motivators: religion.  Each of these aspects of the offense conduct is discussed below.

A.    **Mr. El-Khalifi's Conduct**

Although it goes without saying, it still must be said: the offense conduct is very serious and warrants a commensurate punishment.  A commensurate and just sentence in

10

this case is 25 years in prison, which is not only a very serious punishment, but also is in fact *more than sufficient* to satisfy the purposes of sentencing.  Mr. El-Khalifi has admitted to attempting to bomb the Capitol – armed with a MAC-10 submachine gun and wearing a vest filled with explosives – and committing many overt acts along the way. For purposes of the crime, it matters not that the machine gun was inoperable and the explosives were inert, for Mr. El-Khalifi believed that they would function and that in the process, he would die a martyr.  However, for purposes of sentencing, the Court can consider these facts and other factual mitigators.

First, the offense conduct was relatively short-lived.  According to the Criminal Information, the conduct began and ended between on or about December 1, 2011 and February 17, 2012 when Mr. El-Khalifi was arrested.  At most, the conduct which culminated in the offense began no earlier than September 1, 2011 when Mr. El-Khalifi first met the undercover FBI agent.  Second, although the plot to bomb the Capitol evolved over time, Mr. El-Khalifi's initial desire – which he expressed to one of the undercover agents – did not include any attack on U.S. soil.  Rather, his initial desire was merely to receive training so that he could fight overseas in Palestine, Somalia, or Afghanistan.  At that time, he had no desire to target Americans.

Third, there is no evidence that Mr. El-Khalifi received any training from an actual

terrorist group (as opposed to the training he received from the undercover agents).[6]  Nor is there any first-hand evidence that he ever had contact with an actual terrorist or terrorist group.  As described above, he arrived in this country from Morocco at the age of sixteen in June 1999, PSR ¶ 32, and he has remained here ever since – with no international travel.  Similarly, there is no evidence that Mr. El-Khalifi committed or attempted to commit any terrorist-type act prior to his association with the undercover agents.  Indeed, Mr. El-Khalifi had no prior training on and had never previously used a firearm.

Finally, and perhaps most importantly, Mr. El-Khalifi's inchoate crime did not result in any actual or threatened harm to anyone or anything.  As discussed more fully below, the FBI oversaw and managed the entire "sting."  No one was hurt, no functional bombs or firearms were used (other than those the FBI chose to make functional), and every significant movement by Mr. El-Khalifi was monitored and observed by the FBI, to include even aerial surveillance.  While Mr. El-Khalifi recognizes that this in no way excuses his conduct, it  does distinguish this case from other terrorism cases in which the offense was choate and the harm or threatened harm was real.

**B.**      **The FBI's Conduct**

The FBI initiated its contact with Mr. El-Khalifi through the use of a ruse.  It posted an ad on a Craigslist website from a fictional seller of a Prius knowing or

---

[6]      By actual terrorist group, we mean one that the United States government has designated as a terrorist organization.

believing that Mr. El-Khalifi was looking to broker a purchase of a Prius for a third party.
At the time (August-September 2011), Mr. El-Khalifi was in difficult financial straits.  He
did not have a steady job – his primary employment was helping this third party buy and
sell used cars for which he received a commission.  Further, he was months behind in his
rent, and his parents in Morocco depended on his financial assistance to make ends meet.
Into this financial breach stepped undercover FBI agent "Hussien," who not only
completed the sale of the Prius (resulting in a $200 commission for Mr. El-Khalifi[7]), but
who also became his financial benefactor.

　　　　For example, many of the meetings between Hussien and Mr. El-Khalifi were over
a meal paid for by Hussien, who was aware of Mr. El-Khalifi's financial difficulties.
Moreover, at the conclusion of several of these meals, Hussien gave Mr. El-Khalifi cash
(usually between $100 and $200) to help with groceries, rent, and other expenses.  In
addition, approximately two weeks before the planned attack, Hussien gave Mr. El-
Khalifi $4300 in cash to pay for the latter's rent, which, as noted, was overdue.  All told,
cash payments to Mr. El-Khalifi totaled at least $5700 from September 2011 to February
2012.  Most significantly, Hussien, and later the second government agent ("Yusuf"),
promised to take care of Mr. El-Khalifi's family in Morocco by sending them $500 per

---

[7]　　　Later, Mr. El-Khalifi brokered another car sale between Hussien and the
third party, resulting in another commission.

month to commence after the attack was completed.[8]

These meals, cash payments, and promises to provide for Mr. El-Khalifi's family accomplished two important objectives. First, they freed-up Mr. El-Khalifi to concentrate on the planned attack since his immediate needs (food, rent) were often provided for. Second, the payments and promised payments removed two significant impediments to Mr. El-Khalifi's willingness to complete the mission. First, he needed to settle his debts before the attack, the most significant of which was the arrearages in his rent ($4300). As a devout Muslim, Mr. El-Khalifi believed that dying with debts would prevent his ascension into paradise. Second, he needed to be assured that someone would provide for his parents. As the eldest son, Mr. El-Khalifi believed that one of his most important obligations was to care for his mother and father. Failing to do so would, again, meet with God's disapproval. Without the promise of the "martyrdom payments" to his parents, Mr. El-Khalifi would have had great difficulty completing the mission as he would have been shirking his responsibility to ensure their well-being.

The financial assistance provided to Mr. El-Khalifi was just one of the ways the FBI enabled Mr. El-Khalifi to commit the offense. Mr. El-Khalifi did not have his own transportation, so Hussien picked him up in his car and drove him to all of the undercover meetings (whether they were in Baltimore or West Virginia). Hussien also drove him to

---

[8]    This amount could have been even higher. Mr. El-Khalifi's understanding was that *each* parent was to receive $500 per month.

14

the proposed target locations where car and foot surveillance were conducted. Transportation even included driving Mr. El-Khalifi to the attack itself in an undercover minivan.

Mr. El-Khalifi also did not have a gun or the means to acquire one, so Hussien and Yusuf provided one to him (which they rendered inoperable). The agents also selected the type of gun to be used in the attack – a MAC-10 submachine gun. (Two weeks before the attack Mr. El-Khalifi merely asked for a gun or pistol.[9]) Similarly, the agents provided all of the (inoperable) explosive materials to Mr. El-Khalifi, who did not have the wherewithal or sophistication to be able to acquire them on his own. Finally, the FBI agents trained Mr. El-Khalifi, providing him the necessary confidence to go forward with the attack. This included introducing Mr. El-Khalifi to the second agent (Yusuf) who would assist with the attack; conducting surveillance of proposed targets in Hussien's car; instructing Mr. El-Khalifi on the use and/or assembly of assault weapons (an AK-47 and the MAC-10); arranging for locations to meet (including Hussien's "apartment" and a hotel room); instructing Mr. El-Khalifi on the use and assembly of the explosives, to include a live demonstration in a West Virginia quarry arranged for entirely by the FBI; directing Mr. El-Khalifi on what component parts to buy (cell phones, nails, clothing) to

---

[9]     This is not to suggest that Mr. El-Khalifi was entrapped into using the submachine gun in the attack. When the agents presented the MAC-10 to him on February 14, 2012, Mr. El-Khalifi willingly agreed to use it. The point is that Mr. El-Khalifi would have willingly agreed to use *any* firearm that was presented to him as he had neither the means nor the wherewithal to obtain one himself.

effectuate the attack; and providing advice on where and how to enter the Capitol to ensure success.

The government will argue that Mr. El-Khalifi committed the offense knowingly, voluntarily, and with eyes wide open, and that the idea to bomb the Capitol was his alone. All of this is true. Mr. El-Khalifi has pled guilty and admitted his conduct in the Statement of Facts. He does not intend to shift blame for his actions to the FBI, assert that he was entrapped, or even argue that the FBI's actions were improper. However, it cannot be gainsaid that those actions had an impact on and affected the decisions Mr. El-Khalifi made. In assessing whether 25 years of imprisonment is sufficient punishment, the tactics employed by the FBI cannot be ignored. Mr. El-Khalifi is guilty, of that there is no doubt. But given the entire circumstances of the offense, a 30-year sentence is simply unwarranted.

### C.  The Group Effect and the Impact of Religion on Mr. El-Khalifi's Motivation

Two final considerations bear upon the Court's analysis of the offense conduct. First, the FBI agents convinced Mr. El-Khalifi that he was part of an insular group of like-minded Islamists and further, that he should not violate their trust by, for example, revealing their plans to others outside of the group. This tactic served to both insulate *and* isolate Mr. El-Khalifi. Second, the agents fomented Mr. El-Khalifi's pre-existing belief that his actions were sanctioned by God and in service of Islam. In other words, the FBI not only helped Mr. El-Khalifi with acquiring the *means* and determining the

16

*method* of the attack (see section III.B. above), but also reinforced his *motivation* for the attack.

On its most basic level, the mere presence of other group members can embolden each individual member toward conduct he or she might not have undertaken alone. One can wonder whether Mr. El-Khalifi would have *ever* committed a terrorist act in the United States had he not been presented with the opportunity to work with two such willing and capable partners.[10] While this thought is mere speculation, it is not speculative to say that once the group was bound together, the agents convinced Mr. El-

---

[10]     The International Centre for the Study of Radicalization and Political Violence (ICSR) reports that "self-radicalisation and self-recruitment via the internet with little or no relation to the outside world rarely happens," because "real-world social relationships continue to be pivotal." *See* ICSR, *Countering Online Radicalisation: A Strategy for Action*, Policy Report (2009) at 13, available at http://www.icsr.info/news/attachments/1236768445ICSROnlineRadicalisationReport.pdf (last visited Sept. 6, 2012). It goes on to state that "experts who have studied the problem have concluded that the internet can support and facilitate but never completely replace direct human contact and the ties of friendship and kinship through which intense personal loyalties form." *Id*. In this case, although Mr. El-Khalifi had been exposed to radical messages and materials on the Internet, he did not form "real world relationships" sympathetic to these beliefs until he met undercover agents Hussien and Yusuf. Their explicit validation of Mr. El-Khalifi's feelings and their emphasis on religion, personal loyalties, and secrecy provided the human contact and kinship that helped to facilitate Mr. El-Khalifi's willingness (and material ability) to take violent action. Had his exposure to such radical thinking been confined to the Internet, rather than encouraged by a close and trusted friend such as Mr. El-Khalifi perceived Hussien to be, it is reasonable to suggest that he may have been much less likely to engage in such drastic action. *See also* Institute for Strategic Dialogue, *Radicalisation: The Role of the Internet*, Working Paper (2011), 3, available at http://www.strategicdialogue.org/allnewmats/idandsc2011/StockholmPPN2011_Backgro undPaper_FINAL.pdf (last visited Sept. 6, 2012).

Khalifi that they were the experts and to trust them completely. They assured him they would be with Mr. El-Khalifi every step of the way, even promising to detonate the bomb if Mr. El-Khalifi were prevented from doing so. He was made to feel part of an insular group on a mission, with a purpose.

The agents also isolated Mr. El-Khalifi from outside influences. They repeatedly reminded him not to speak with others about their plans. Doing so, he was told, would violate their trust in him, resulting in expulsion and a severing of a very close friendship he thought he had formed with Hussien. That friendship had been forged over many conversations, meals and trips together and the FBI undoubtedly hoped that the binds of friendship would hold Mr. El-Khalifi fast and wash away all of his doubts.

Overlaying this relationship was religion, which served to bolster Mr. El-Khalifi's resolve. He believed that he was acting on behalf of God and at His direction. This belief was outwardly shared and reaffirmed by the undercover agents. It needs no citation to say that religious motivation is powerful. Its power was magnified here by the agents' words and deeds, which led Mr. El-Khalifi to believe that his views were shared by them and many others and that those views were righteous. Each conversation the agents had with Mr. El-Khalifi about the sufferings of the Palestinians, the blasphemies of the U.S. Government, and an Islamist's obligation to seek paradise through concrete action, reinforced those views. They were further reinforced through each repetition of "Allahu Akbar" ("God is Great") – which the agents did repeatedly – and the unfailing and

18

virtually unequivocal support the agents provided.

The agents of course, were just playing a role which the law permits them to play. But it was a role wrapped in a spiritual mantle making the planned attack appear more compelling and urgent to Mr. El-Khalifi.  Without casting aspersions on the FBI's tactics, the Court can properly consider the extent to which those tactics affected Mr. El-Khalifi's motivations, and what he might have done had the agents, instead of insulating him and telling him not to share their plans with anyone else, instead encouraged him to validate his beliefs with outsiders, for example an Imam at his mosque or a family member.

Again, Mr. El-Khalifi does not contend that these facts excuse his conduct; indeed, he admits and has accepted responsibility for his actions.  PSR ¶¶ 11-12.  Rather, these facts "provide a useful context" for this Court because, "[i]n determining a sentence, it is worth attempting to understand (as best one can) what set a defendant upon [an] illegal course."  *United States v. Blake*, 89 F. Supp. 2d 328, 332 (E.D.N.Y. 2000).  Because one of the central goals of sentencing is to impose a "just" punishment, 18 U.S.C. § 3335(a)(2)(A), courts must look to the specific circumstances surrounding a defendant and his offense conduct.  As the Supreme Court recently reminded sentencing courts,

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.

*Pepper v. United States*, 131 S. Ct. 1229, 1239–40 (2011) (internal citations and quotations omitted).  Given, *inter alia*, the motivations that led Mr. El-Khalifi to commit the crime, his conduct, the tactics employed by the FBI and other factors to be discussed, 25 years of imprisonment is a "just" sentence.

**IV.    Retribution, Deterrence and Protection of the Public Are All Served by a Sentence of Not More Than 25 Years**

Section 3553(a) requires this Court to assess the need to protect the public and to deter defendants such as Mr. El-Khalifi from future criminal conduct.  This is often particularly relevant in terrorism cases in which defendants may hold strong beliefs about the need to attack American interests in the United States or abroad upon their release from prison.  Mr. El-Khalifi is not one of those defendants.  Mr. El-Khalifi did not engage in his conduct out of hatred toward the United States, but because he believed that God had instructed him to do so.  While this may be a distinction without a difference in terms of the potential impact of his conduct had it been successful, it is a significant factor to consider in evaluating both the level of retribution warranted and the possibility that Mr. El-Khalifi will be a threat to the United States in the future.

Mr. El-Khalifi will not pose such a threat for a number of reasons.  First, unlike many defendants in terrorism cases, Mr. El-Khalifi does not hate the United States.  He has expressed happiness that no one was hurt or killed at the Capitol and has pleaded guilty and accepted responsibility for his actions.  PSR ¶¶ 11-12.  Second, Mr. El-Khalifi's acts were part of a controlled FBI sting operation in which no one was ever

20

placed in actual danger, and no contact was ever made between Mr. El-Khalifi and any terrorist organization.  Third, Mr. El-Khalifi is 29 years old and should be in Criminal History Category I, were it not for the artificial § 3A1.4 terrorism enhancement.  If he receives a 25-year sentence, he will be 54 when he is released from jail and deported to Morocco.  The Sentencing Commission has recognized both that an offender with this limited criminal history is less likely to recidivate, and also that recidivism rates decline dramatically with age.  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004).[11]  Moreover, because it is the certainty, not the severity, of punishment that best serves as a general deterrent to the public at large, a sentence of 25 years would more than adequately fulfill § 3553(a)(2)(B)'s goal of "afford[ing] adequate deterrence to criminal conduct."

Finally, Mr. El-Khalifi will be deported after serving his sentence, a factor the Court should consider in determining what impact the length of the sentence will have in protecting the public.  *See United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 733 (E.D. Va. 2005) (noting the decreased need to protect the public from further crimes of the defendant when he "will ultimately be removed and sent out of the country"); *United States v. Biheiri*, 356 F. Supp. 2d 589, 603 (E.D. Va. 2005) (observing that the goal of

---

[11]     This publication is available at http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_C riminal_History.pdf  (last visited Sept. 7, 2012).

protecting the public was "of little import" where the defendant was going to be deported

to Egypt immediately following his release from custody).  In addition, Mr. El-Khalifi has

expressed a desire to satisfy his religious obligation, as the eldest son, to provide for his

family when he returns to Morocco, including his younger siblings who may be without

parents by that time.[12]

The world will be a very different place in 25 years, and Mr. El-Khalifi will be a

fundamentally different person by the time he is released from prison and deported to

Morocco.  The goals of retribution, deterrence, and protection of the public will all be

served by a sentence of 25 years in prison, and those goals would not be further satisfied

by the imposition of a longer term.  Such a sentence would also be commensurate with

sentences imposed in other similar recent cases, as discussed below.

## V.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants Who Have Been Found Guilty of Similar Conduct

Under the Guidelines, most terrorism and attempted terrorism offenses involving

weapons of mass destruction (or devices defendants believe to be weapons of mass

destruction) result in a Guidelines sentence recommendation of life in prison.  *See*

U.S.S.G. §§ 2M6.1 (base offense level of 42 for offenses with intent to injure the United

States or aid a foreign nation or foreign terrorist organization); 3A1.4(a) (12-level

---

[12]     It is worth noting that, even if he is sentenced to a 25-year term of imprisonment, there is a limited probability that Mr. El-Khalifi's parents will still be living when he returns to Morocco.  This fact contributes to the level of retribution that will be imposed by any sentence in this case.

enhancement for offenses intended to promote federal crime of terrorism); 3A1.4(b)

(providing for automatic and artificial application of Criminal History Category VI for

terrorism-related offenses).  This is true of all other recent weapon of mass destruction

cases involving FBI "stings."

Sentences imposed in terrorism cases should, however, recognize the distinction

between cases involving actual weapons of mass destruction and cases involving inert or

false weapons provided by the government, and the distinction between the attempted use

of such a weapon and the actual use of such a weapon.  Perhaps recognizing these

distinctions, courts in similar cases involving (inert) weapons of mass destruction

provided by the FBI during the course of sting operations have sentenced defendants to

terms of imprisonment ranging from 24 years to 35 years.  *See* Chart of Notable

Terrorism Cases Involving FBI Sting Operations, attached as Exhibit 2.  We are unaware

of a single FBI "sting" case that has resulted in a life sentence and the case with the facts

most similar to the facts in this case, *United States v. Smadi* (discussed below), resulted in

a sentence of 24 years in prison.[13]

---

[13]     These sentences are distinguishable from sentences that have been imposed
in cases involving actual weapons of mass destruction.  *See, e.g., United States v.
Shahzad*, Case No. 1:10-cr-541 (S.D.N.Y., sentence imposed Oct. 5, 2010) (defendant
who unsuccessfully attempted to detonate a car bomb in Times Square in New York City
sentenced to life in prison without possibility of parole after pleading guilty to a 10-count
indictment that included charges of attempted use of a weapon of mass destruction and
conspiracy to use a weapon of mass destruction); *United States v. Abdo*, Case No. 6:11-
cr-182 (W.D. Tex., sentence imposed Aug. 14, 2012) (defendant, a U.S. Army soldier,
convicted by jury of attempted use of a weapon of mass destruction and attempted murder

The defense has identified five cases in which sentences have been imposed to date that have involved the charge of attempted use of a weapon of mass destruction relating to an FBI sting.  The first case, *United States v. Shareef*, involved a U.S. citizen who plotted with undercover agents to purchase hand grenades and other weapons for purposes of killing citizens in an Illinois shopping mall.  The defendant in that case entered a guilty plea to the attempted use of a weapon of mass destruction.  He did not enter into a plea agreement; nor did he attempt to negotiate the terms of any sentence to be imposed.  He was sentenced to 420 months (35 years) in prison.  *See United States v. Shareef*, Case No. 1:06-cr-00919 (N.D. Ill.) (sentence imposed Sept. 30, 2008).

Another prosecution, referred to as the "Newburgh Four" case, involved three U.S. citizens and one Haitian immigrant who plotted with undercover agents to bomb synagogues in New York City and to attack airplanes at Newburgh airport using anti-aircraft ("Stinger") missiles.  All four defendants proceeded to trial and were convicted by a jury of numerous offenses, including conspiracy to use weapons of mass destruction within the United States, three counts of attempted use of a weapon of mass destruction, attempt to acquire and use anti-aircraft missiles, and conspiracy to murder officers and

---

of U.S. military members after being arrested near Fort Hood, Texas in possession of firearms and bomb-making materials, sentenced to two consecutive life sentences).  For the same reason, the government's reliance on the cases of Ahmed Ressam and Abu Ali is misplaced.  Govt's Position on Sentencing at 5.  Both of these defendants were members of and had trained with *actual* terrorist groups overseas and were arrested while plotting *real* (as opposed to FBI orchestrated) attacks inside the United States.

employees of the United States.  All four defendants were sentenced to 300 months (25 years) in prison, the minimum sentence the court was authorized to impose as a result of a 25-year mandatory minimum relating to the anti-aircraft missile charges under 18 U.S.C. § 2332g.  *See United States v. Cromitie, et al.*, Case No. 7:09-cr-00558 (S.D.N.Y.) (sentences imposed June 29, 2011 and Sept. 7, 2011).

Three cases that have been sentenced to date involve facts more similar to those at issue here.  In the first, *United States v. Finton*, the defendant, a U.S. citizen, plotted with undercover agents to bomb a federal building in Springfield, Illinois, drove a truck loaded with what he believed to be explosives to the building, and attempted to detonate the explosives.  The defendant entered a guilty plea to one count of attempted use of a weapon of mass destruction and, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), agreed to a negotiated sentence of 336 months (28 years) in prison, which the court accepted and imposed.  *See United States v. Finton*, Case No. 3:10-cr-30215 (S.D. Ill.) (sentence imposed May 9, 2011).

More recently, in a case in Maryland, the defendant, a U.S. citizen, plotted with undercover agents to attack a military recruiting station in Maryland and was arrested after attempting to detonate an inert bomb provided to him by the FBI outside the recruiting station.  The defendant pleaded guilty to one count of attempted use of a weapon of mass destruction.  The Rule 11(c)(1)(C) plea provided for a sentence of 300 months (25 years) in prison, which the court accepted and imposed.  *See United States v.*

25

*Martinez a/k/a Hussain*, Case No. 1:10-cr-00798 (D. Md.) (sentence imposed Apr. 6, 2012).

Finally, in *United States v. Smadi*, the defendant, an immigrant from Jordan who was in the United States illegally, plotted with undercover agents to bomb an office building in Dallas using a truck bomb. The defendant was arrested after parking a truck containing what the defendant believed to be explosives outside the building and attempting to detonate the explosives. The defendant entered a guilty plea to one count of attempted use of a weapon of mass destruction and entered into a plea agreement pursuant to Rule 11(c)(1)(C) that provided for a sentence of imprisonment of not more than 360 months (30 years). The court accepted the plea and, after holding a two-day sentencing hearing involving multiple witnesses, imposed a sentence of 24 years. *See United States v. Smadi*, Case No. 3:09-cr-00294 (N.D. Tex.) (sentence imposed Oct. 19, 2010).

The *Smadi* case is most similar to the instant case not only because of the facts of the offense, but because of the particular characteristics of the defendant and the context of the crime. According to the evidence introduced at the sentencing hearing, Mr. Smadi came to the United States for a visit from Jordan when he was 16 years old, overstayed his visa while staying with a family friend, and attended public high school in the United States. *See* Tr. of Sentencing Hearing held Oct. 18-19, 2010 [D.E. 96] at 136. At the time, he was not particularly religious, and he got involved in a lifestyle that involved partying and recreational drug use, including use of hard drugs like ecstasy and cocaine.

26

*See id.* at 137.  At some point in his late teens or early 20's, Mr. Smadi began to embrace

Islamic extremism and came into contact with several undercover government operatives

with whom he planned to engage in the attack for which he was ultimately prosecuted.  In

imposing the sentence, the court described a factual situation very similar to that at issue

here, stating as follows:

> I know you did not have the tools to do this by yourself.  It should be clear,
> and if it's not, I will say it.  There is absolutely no indication that you had
> any contact with any terrorist organizations, bin Laden, trained in
> Afghanistan, Iraq, or had any training of any kind.  But you were looking
> for someone to join you in this evil enterprise, and thank goodness you
> found the government there.  Because I know that your counsel would like
> to convince me that had it not been for the government this never would
> have happened, and I just don't know that, because someone else might
> have taken the bait that you put out there.  That may have been a person
> who had genuine evil intentions for this country. . . .  Because your mental
> state, whatever motivated it, was such that I think had you gotten in the
> wrong hands; that is, someone who meant what [undercover operatives]
> Hussein and Rafiq and the other undercover were actually saying, could
> have manipulated you to perform the act that you only thought you were
> performing.

*Id.* at 141, 143.  Ultimately, the court determined that a sentence of 24 years in prison was

sufficient but not greater than necessary to achieve the purposes of sentencing set forth in

Section 3553.

The *Smadi*, *Martinez*, and *Finton* cases all involved defendants who were arrested

after attempting to detonate what they believed to be explosives in public places, and

resulted in sentences of 24, 25, and 28 years in prison, respectively.[14]  While the truck

bombs that Mr. Smadi and Mr. Finton attempted to use could arguably have caused more

casualties than the explosive vest Mr. El-Khalifi believed he could detonate, all three

cases, particularly the *Smadi* case given its specific facts, provide guidance to the Court in

determining an appropriate sentence to be imposed in this case.  A sentence of 25 years in

prison would comply with the plea agreement and the statutory purposes of sentencing

while simultaneously avoiding unwarranted sentencing disparities between this case and

similar cases.

## CONCLUSION

Accordingly, for the foregoing reasons, Mr. El-Khalifi respectfully asks the Court

to accept the Plea Agreement and impose a sentence of imprisonment of no more than 25

years.  Moreover, Mr. El-Khalifi requests that the Court not impose a fine given his

inability to pay one.  See PSR ¶ 51.  Finally, Mr. El-Khalifi asks that the Court

recommend to the Bureau of Prisons that he be incarcerated at the BOP facility in Terre

Haute, Indiana.[15]

---

[14]      A fourth similar case, *United States v. Hassoun*, involves a defendant who
entered a guilty plea to two offenses, including one count of attempted use of a weapon of
mass destruction, after being arrested while attempting to detonate what he believed to be
an explosive device placed in a trash can near Wrigley Field in Chicago.  The defendant
in that case entered into a plea agreement under Rule 11(c)(1)(C) providing for a sentence
of between 20 and 30 years in prison.  His sentencing is scheduled for December of 2012.
*See United States v. Hassoun*, Case No. 1:10-cr-00773 (N.D. Ill.) (plea agreement filed
Apr. 23, 2012).

[15]      The government does not oppose this request.  PSR ¶ 4, Plea Agmt. ¶14.

Respectfully submitted,

AMINE EL-KHALIFI
By Counsel

_____/s/_____
Kenneth P. Troccoli, Esq.
Virginia Bar Number 27177
Joshua Paulson, Esq.
Virginia Bar Number 79703
Attorneys for the Defendant
Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia  22314
(703) 600-0800 (T)
(703) 600-0880 (F)
Kenneth_Troccoli@fd.org (e-mail)
Joshual_Paulson@fd.org (e-email)

Kristine A. Rembach, Esq.
Pro Bono Co-Counsel for the Defendant
Katten Muchin Rosenman LLP
2900 K Street N.W., Suite 200
Washington, D.C.  20007
(202) 625-3500 (T)
(202) 298-7570 (F)
Kristine.Rembach@kattenlaw.com (e-mail)

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2012, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gordon D. Kromberg, Esq.
Michael P. Ben'Ary, Esq.
Assistant United States Attorneys

29

2100 Jamieson Avenue
Alexandria, Virginia  22314
(703) 299-3700
Gordon.Kromberg@usdoj.gov
Michael.Ben'Ary2@usdoj.gov

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.  A courtesy copy also will be delivered by inter-office mail to Nina Blanchard, Senior U.S. Probation Officer, 401 Courthouse Square, Alexandria, Virginia 22314.

_____/s/_____
Kenneth P. Troccoli, Esq.
Virginia Bar Number 27177
Attorney for the Defendant
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia  22314
(703) 600-0780 (T)
(703) 600-0880 (F)
Kenneth_Troccoli@fd.org (e-mail)