UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

_____

**UNITED STATES OF AMERICA**

   **v.**

                            **No. 1:12-CR-037**

**AMINE KHALIFI,**

                            **MEMORANDUM OF LAW**

       Defendant.

_____

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (& MODIFICATION OF SENTENCE BASED ON EXTRAORDINARY AND COMPELLING REASONS)

Amine Khalifi, by undersigned counsel, submits the instant Memorandum of Law in support of his motion for a modification of his sentence based on extraordinary and compelling reasons, which include his high risk from COVID-19 based on his Hodgkins Lymphoma.

The current COVID-19 epidemic poses an extraordinary and compelling reason to release Mr. Khalifi. As stated in *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020), the House Judiciary Committee urged on March 19, 2020 that all existing authority be utilized to reduce the number of people in federal prisons, especially those who have health conditions putting them at high risk from the virus. Since that time, many courts have granted compassionate release to these highly vulnerable prisoners.

1

The virus is already spreading at alarming rates in many federal prisons. On April 1, there were 57 cases where inmates had tested positive for the virus in federal prisons; as of October 23, that number skyrocketed to 16,884. FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited October 26, 2020) (the number represents the total number of BOP inmates who have tested positive including those who have recovered). The actual number of cases is probably much high is as testing is often not done. *128 BOP inmates have already died from COVID-19. Id.*

Mr. Khalifi suffers from cancer - Hodgkins Lymphoma - which clearly puts him at risk for serious complications or death from COVID-19, according to the CDC. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#cancer

The cancer puts him at increased risk, and so does the treatment he has been receiving, as discussed below. Moreover, the cancer and accompanying treatment is not the only CDC-noted risk factor for Amine Khalifi – he also has been diagnosed with obesity, another clear risk factor according to the CDC.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity

**Defendant's Underlying Case**

Amine Khalifi was convicted via a guilty plea, in a sting operation, of Attempted Use of a Weapon of Mass Destruction (trying to blow himself up at the

US Capitol), and was sentenced to 30 years in 2012. He has served close to nine years at this point, and is scheduled to be released in seventeen years, in 2037. So he has served more than a third of his sentence, but less than half.

Certainly the offense was very serious, but even back in 2012 Mr. Khalifi expressed relief that he had not been able to actually carry out the plans he made with the FBI agents.  In addition to the compelling mitigating factors presented at the time of sentencing, at this point Mr. Khalifi has an excellent record of rehabilitation, and he has submitted a recent statement apologizing for his prior actions and intentions, and completely disavowing any intent to support terrorism in the future. He only wants to go home to Morocco and provide for his aging parents, and be with them and his other family members there.

In 2007, Amine Khalifi, who had been involved with drugs as part of the club scene in Washington DC, started committing himself to his religion, and stopped using drugs and alcohol. While this was a very positive development, as sometimes occurs when someone becomes newly religious, he started becoming very alienated by much of American culture. A few years later, after watching videos of atrocities against Muslims, he started thinking that his religion required him to take some sort of action to right these wrongs.

Mr. Khalifi initially was interested in traveling overseas to get training and fight for what he perceived as Muslim causes. It wasn't until after he was

befriended by two undercover FBI agents in 2011 that he had any thoughts of committing some sort of attack in the United States. (Defense Sentencing Memorandum, at 9) As described at length in the Defense Sentencing Memorandum, it was the FBI who enabled Mr. Khalifi to commit the instant offense, by convincing him to engage in a suicide bombing in the United States, giving him "religious" reinforcement, and by making sure all his financial obligations were covered. The FBI also provided all the (inoperable) weapons and training

All of the activity described in the offense conduct section took place during a 2 ½ month period between December 1, 2011 and February 17, 2012. Although he had vague plans of going overseas to aid Muslims, Mr. Khalifi had never actually tried to contact any terrorist groups, and had not expressed any desire to take any action in the United States, or to target civilians, until he started speaking to the undercover agents. (Defense Sentencing Memorandum at 11-12)

Significantly, because Mr. Khalifi was involved in selling cars at the time, and was struggling financially, desperate to send money home to his parents, who were in a very bad situation, the undercover agents first approached him by placing a Craig's List add for a car. (Defense Sentencing Memorandum at 12) The ruse worked, Mr. Khalifi profited by reselling the car, and the agent ("Hussein") (who

then sold him another car) then became his financial benefactor. (Defense Sentencing Memorandum at 13)

The FBI agent (along with the second agent who was introduced later) convinced Mr. Khalifi that he had to trust only them on religious matters, and encouraged his nascent beliefs that he was religiously required to take violent action. (Defense Sentencing Memorandum at 16, 18) The agents spoke to him of the suffering of Palestinians; the evils of the United States government; and the religious requirement to take action. (Defense Sentencing Memorandum at 18) All this went a long way to convincing Mr. Khalifi to commit the instant offense, but there was more.

After discussing the need to take action, the agent (who claimed to be with Al Qaeda) started giving Mr. Khalifi money for rent (including back rent he had been unable to pay), meals and other expenses. (Defense Sentencing Memorandum at 13) All told, he paid Mr. Khalifi $5700. (Defense Sentencing Memorandum at 13) Very significantly, the agent promised to care for Amine Khalifi's family in Morocco if he would blow himself up in a suicide bombing. (Defense Sentencing Memorandum at 13) This was very important to Mr. Khalifi, as he believed that, as the oldest son, it was his religious obligation to care for his parents, and also that he would not get into paradise if he died with debts. (Defense Sentencing Memorandum at 14)

The agents then selected the (inoperable) gun to be used in the attack, and gave it to Mr. Khalifi – they also provided the (inoperable) explosive material, and taught him how to use them. (Defense Sentencing Memorandum at 15) They also told him exactly what components (cell phones, etc) he needed to buy, and gave him the money to do so. Finally, the agents directed him as to how and where to enter the Capitol building.

It is submitted that if it hadn't been for the involvement of the FBI, this offense never would have occurred. While it was of course reprehensible that Mr. Khalifi had a desire to take some violent action out of a misguided belief as to his religious requirements, and that he then worked with the FBI agents to create a plan, and tried to carry it out, this cannot be divorced from all the encouragement, money, and manipulation by the FBI.

As noted in the Presentence Investigation Report (PSR,) Mr. Khalifi told the Probation Department that after his arrest, he was grateful that no one had been hurt or killed, and he was willing to accept punishment for his wrongful acts. (PSR, at 12)

Recently, Amine Khalifi submitted a handwritten statement, dated August 3, 2020, in which he apologized for his actions, stating:

> "…I want to say that I am very sorry and also sad for my actions, I am relieved that innocent people didn't get hurt, I['ve] been reflecting on that since my incarceration. …At that time I was in a very dark place … had no job, I owed 3 months rent, and w[as] about to be evicted, it was shameful.

Then came along a man with a solution to my problems. …My parents rel[ied] on my to provide, and one of the solutions that the man (FBI) provided [was] that my parents will be taken care of. … I have no desire to engage in violence, I['ve] been locked up almost 9 years without a single incident of violence… I pose a threat to no one. …All I want and think about is to be next to my parents before they expire, and also marry and have kids. I believe in my heard that God prohibit[s] us from harming his creation, whether it be humans, animals or plants. I am so sorry for even thinking of harming innocence people and trying such [a] horrible act." (Statement attached as Exhibit "C")

**The Case of United States v. Sami Hassoun**

There is a very similar case in which a defendant was recently granted compassionate release based on medical conditions which put him at great risk if he were to contract COVID-19 in prison. *United States v. Hassoun*, 2020 U.S. Dist. LEXIS 129945  (NDIL July 3, 2020.) That case was also a sting operation. The defendant, Sami Hassoun, intended to place a bomb in Wrigley Field in Chicago, which would have caused huge civilian casualties. He chose to do this on a Saturday night in order to maximize the casualties, and he was arrested when he was trying to deposit what he believed was an operable bomb in a waste bin in Wrigley Field.

Mr. Hassoun was convicted of one count each of attempted use of a weapon of mass destruction, 18 U.S.C. § 2332a(a)(2)(D), and attempted use of an explosive device, § 844(i). He was sentenced to 23 years, and had served less than 10 years when he was granted release. Mr. Hassoun was only 32 years old at the time the motion was filed, but he suffered from Familial Mediterranean Fever, an

7

autoimmune disease which was likely to increase his risk from COVID-19 complications. The facility where he was imprisoned (USP Leavenworth) had no active cases of COVID-19 at the time the motion was filed, or when it was granted.

While this case was similarly serious, it is submitted that Mr. Khalifi's cancer puts him at even greater risk from the virus than Mr. Hassoun's autoimmune disease, and, significantly, the prison he is in, FMC Butner, *does* have active COVID-19 cases – *10 inmates and 4 staff* were reported being positive for the disease as of October 23, 2020 – this was a sharp increase from 2 days earlier, when only 4 inmates were reported to be positive. (See bop.gov/coronavirus/ - full breakdown, last accessed 10/26/20.)

It is also noteworthy that Ali Al-Timimi, who was serving a *life sentence for terrorism, in the ADX Supermax prison, under Special Administrative Measures,* was recently granted bail pending appeal in this district, due in part to the risk posed to him by COVID-19. *United States v. Al-Timimi*, 2020 U.S. Dist. LEXIS 149238 (EDVA August18, 2020.)

**Mr. Khalifi has exhausted his administrative remedies under 18 USC 3582(c)(1)(a)**

Mr. Khalifi is currently incarcerated, under BOP Register Number 79748-083, at the FMC Butner, a Federal Medical Prison. On April 17, 2020, counsel submitted an application for compassionate release under § 3582(c)(1)(A)(i) to the warden of his facility. (Compassionate Release Application attached as Exhibit

"A" at 1). The warden denied his application on May 5, 2020. (Warden Response attached as Exhibit "A" at 2[1]). As it has been more than 30 days since the warden received Mr. Khalifi's request, he has exhausted his administrative remedies under 18 USC 3582(c)(1)(a), which provides that the court may act 30 days after the warden receives the application. *See United States v. Brooker*, 2020 US App. LEXIS 30605 (2nd Cir. 2020.)

## ARGUMENT

A court may reduce a sentence imposed when "extraordinary and compelling reasons" warrant reduction and when "such a reduction is consistent with policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). A court granting reduction must also "consider the sentencing factors set forth in 18 U.S.C. § 3553(a) 'to the extent they are applicable.'" *United States v. Holmers*, 2020 WL 3036598, at *1 (D. Minn. June 5, 2020) citing 18 U.S.C. § 3582(c)(1)(A).

In *Woodard v. United States,* 2020 U.S. Dist. LEXIS 117186 (EDVA June 26, 2020) (and other decisions from this district) the court held that the Sentencing Commission policy statement dealing with compassionate release, 1B1.13, was

---

[1] For some reason, although the application did not state that it was being filed due to a terminal medical condition, the prison interpreted in that way, as shown by the denial, and by a medical record which states, "Received an attorney letter dated 4/17/20 from Mr. Khalifi requesting consideration for compassionate release under "Terminal" with concern for COVID-19."(Exhibit "B" at 30) Another medical record stated "Per Medical Staff Mr. Khalifi does not meet the "Terminal" criteria at this time. Therefore a denial memo was sent to the RIS coordinator for review and routing to the Warden." (Exhibit "B" at 29)

only advisory, as it purported to require a motion to be made by BOP, a requirement which was vitiated by Congress in the First Step Act. In *United States v. Brooker*, 2020 US App. LEXIS 30605 (2nd Cir. 2020) the Second Circuit Court of Appeals went even further, holding that 1B1.13 simply had no applicability whatsoever with regard to motions brought by the defendant rather than by BOP.

## POINT I

### THE RISK POSED BY COVID-19 IS AN EXTRAORDINARY AND COMPELLING REASON TO REDUCE PETITIONER'S SENTENCE TO TIME SERVED

The risk posed by COVID-19 constitutes an extraordinary and compelling reason to reduce the sentence of a defendant who is particularly vulnerable to serious illness or death from the virus due to old age or underlying medical conditions. Many courts, including in this district, have granted such motions. *Zellner v. United States*, 2020 US Dist. LEXIS 160243 (EDVA September, 2020) (motion granted for man sentenced to 384 months in drug conspiracy involving kidnaping); *Woodard v. United States,* supra (granting emergency compassionate release motion to man who was at clear risk were he exposed to COVID-19, *even though he had only served a small percentage of his sentence*.) *United States v. Provost,* 2020 U.S. Dist. LEXIS 131727 (EDVA July 24, 2020) (granting release to defendant with asthma and other conditions who had served less than half of her sentence)

10

Mr. Khalifi is acutely vulnerable to serious illness or death from COVID-19, as he suffers from Hodgkins Lymphoma. As numerous courts have observed, the nature of a prison setting puts inmates at great risk of catching coronavirus as it is impossible for inmates to adequately protect themselves from the virus through social distancing. *The virus has reached FMC Butner, and it may soon be too late for Mr. Khalifi.*

**Defendant's Hodgkins Lymphoma, and its Treatment, make him highly vulnerable to serious illness or death from COVID-19.**

As noted above, cancer is among the medical conditions which the CDC has found poses a *clear risk* of serious complications or death from COVID-19.  In addition, it has been established that cancer treatments, such as chemotherapy, increase the risk of severe complications from the virus. See

https://www.cancer.org/treatment/treatments-and-side-effects/physical-side-effects/low-blood-counts/infections.html

Amine Khalifi found lumps on his neck around 2014; in 2018 a CT of the neck found adenopathy (swollen lymph nodes); a PET scan (cancer diagnostic tool) was done in 2018 *but is missing*; and a biopsy in July, 2019 definitively established Hodgkins Lymphoma. (Exhibit "B" at 1, 3) This was found to be Stage II Hodgkins Lymphoma. (Exhibit "B" at 11, 13)

Mr. Khalifi underwent four rounds of chemotherapy between November, 2019 and February, 2020. (Exhibit "B" at 1, [stating "Nov 2019-Feb 2020 ABVD

x 4c"]; 6) However, despite a purportedly negative PET scan, on examination on

March 4, 2020, he was still found to have lumps and swollen lymph nodes,

indicating the disease was still active. (Exhibit "B" at 9; 11 – Page 11 states,

"…[P]hysical examination revealed multiple residual disease in the bilateral neck")

As a result of the persistent disease, Amine Khalifi underwent radiation

therapy to his neck between April 24 and May 19, 2020. (Exhibit "B" at 15-19)

The website lymphomanewstoday.com posted about the increased risk posed

by COVID-19 to Lymphoma patients in particular, stating:

> "Patients with hematological malignances such as acute myeloid leukemia (AML), *lymphoma*, and myeloma may be particularly vulnerable as these cancers weaken the immune system. Chemotherapy, immunotherapy, and radiation therapy can also weaken the immune system and increase the risk of patients undergoing these treatments to become infected with SARS-CoV-2. Even patients who are not receiving active cancer treatment need to be cautious as the effects of past therapy are usually long-lasting.
> ***Lymphoma patients should take extra precautions to minimize the risk of getting COVID-19.*** In addition to the general preventive measures listed above, patients should:
> - Stock up on necessary medications and supplies that can last for a few weeks.
> - Avoid crowds and non-essential travel.
> - Stay at home as much as possible.
> Boosting the immune system by keeping stress levels low, getting adequate sleep, moderate physical exercise, and good nutrition can also be helpful."
> https://lymphomanewstoday.com/information-about-covid-19-for-lymphoma-patients/, accessed on August 26, 2020, emphasis supplied.

Along those lines, a September, 2020 article on the Cancerhealth website

noted that lymphoma patients are at more risk from COVID-19 than most cancer

patients. https://www.cancerhealth.com/article/covid19-changing-face-cancer-care

The article stated:

> "…[P]eople with cancer are not all alike. Studies have consistently shown that people with lung cancer or blood cancers, such as leukemia or lymphoma, have worse outcomes. While the overall mortality rate for people with cancer in the CCC19 analysis was 16%, this rose to 19% for those with colorectal cancer, 22% for those with lymphoma and 26% for those with lung cancer. As discussed more below, it is *impossible* to take the recommended social-distancing precautions in a prison environment, and it is also hard to avoid stress in prison. It is clear that, according to CDC guidelines, and the above Lymphoma website, Amine Khalifi's Hodgkin's Lymphoma and accompanying treatments do put him at a high risk of serious complications or death should he contract COVID-19."

**Obesity**

In addition to the Lymphoma, Mr. Khalifi is at additional risk because he is obese. The CDC has stated that anyone with a BMI (Body Mass Index) higher than 30.0 faces a clear, known risk of serious complications from COVID-19.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity

Amine Khalifi's medical records show that he is obese, and his weight has been increasing over time. (Exhibit "B" at 7, 21, 23, 25, 27) On October 30, 2019, his weight was said to be 216.6 pounds, and his height was said to be *70 inches*. (Exhibit "B" at 25) That corresponds to a BMI of 31.1[2]. On January 21, 2020, Mr.

---

[2] BMI is calculated by dividing the weight (in pounds) by the square of the height (in inches) and multiplying the result by 703. https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html#Interpreted However, counsel utilized a calculator at https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm in order to get the BMI values used herein (other than the value for November 1, 2019, where the medical records stated there was a BMI of 30.5 – Exhibit "B" at 21.)

Khalifi's weight was said to be 217 pounds, but for some reason his height was now listed as *72 inches*, which made the BMI on that date only 29.4. (It is submitted that Mr. Khalifi did not grow taller between October and January, so it is not clear why the height measurement increased by two inches, but the 72 inch measurement was repeated in the subsequent documents.)

By March 4, 2020, Amine Khalifi's weight was up to 225 pounds which, given a height of 72 inches, resulted in a BMI of 30.5, again in the obesity range. (Exhibit "B" at 7) (It is also noted that 225 pounds with a height of 70 inches yields a BMI of 32.3, and that same weight at 71 inches yields a BMI of 31.4. It seems likely that the height may be closer to 71inches than either 70 or 72, but the reason for the two inch discrepancy is unknown.)

The latest measurements contained in the records counsel received from Mr. Khalifi reflect a weight of *234* pounds and a height of 72 inches on April 22, 2020, resulting in a BMI of 31.7. (Exhibit "B" at 27) Again, if the height was 70 inches, this weight would result in a BMI of *33.6*, while 71 inches yields a BMI of 32.6.

In any event, Amine Khalifi is clearly obese, and his weight has been increasing. This is a second clear risk factor for serious complications from COVID-19.

**Case Law**

There are many cases where compassionate release was granted because the inmate's cancer/cancer treatments put him or her at risk of serious complications from COVID-19. Prostate cancer was often the condition cited, and, upon information and belief, this is generally not as serious as Lymphoma. *United States v. Krokos*, 2020 U.S. Dist. LEXIS 90801 (CDCA May 1, 2020 (release granted for man with *Lymphoma at FMC Butner*); *United States v.* Archer, 2020 U.S. Dist. LEXIS 127623 (DNV July 20, 2020) (man with *Lymphoma in remission* but who remained in *FMC Butner* granted release); *United States v. Heitman*, 2020 WL 3163188 (NDTX June 12, 2020) (man with prostate cancer released); *United States v. Brown*, 2020 U.S. Dist. LEXIS 114124, at 21 n.6 (EDTN June 29, 2020) (defendant with breast cancer); 2020 U.S. Dist. LEXIS 96719 (NDCA June 2, 2020) (granting release to a 61-year-old defendant with prostate cancer); *United States v. Szucs*, Docket No. 17 Cr. 373 (S.D.N.Y. June 25, 2020) (kidney cancer); *United States v. Chapman*, 2020 U.S. Dist. LEXIS 96356 (NDIL June 2, 2020) (man with prostate cancer granted release); *United States v. Whyte*, 2020 US Dist. LEXIS 92318 (WDV May, 2020) (man with prostate cancer granted release); *United States v. Hansen*, 1:07-cr-00520-KAM-2, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020) (granting release based on inmate's prostate cancer); *US v Fandel,* 2020 U.S. Dist. LEXIS 132418 (NDIA July 27, 2020) (man with breast cancer who

hasn't yet started treatment released); *United States v. Winckler*, 2020 WL 1666652 (WDPA Apr. 3, 2020) (granting compassionate release based on metastatic thyroid cancer); *United States v. Joling*, 2020 WL 1903280 (DOR Apr. 17, 2020) (granting compassionate release to a defendant with high-risk group 2 prostate cancer, among other conditions); *United States v. Hammond*, 2020 WL 1891980 (DDC Apr. 16, 2020) (granting compassionate release to a defendant with "recently resurgent prostate cancer"); *United States v. Smith*, 2020 WL 1849748 (SDNY Apr. 13, 2020) (granting compassionate release to a 62-year-old defendant with a *suspected* bone marrow cancer) *United States v. McCullough*, 2:15-cr-160-MRH-3 (WDPA Aug. 8, 2019) (order granting compassionate release to defendant with pancreatic cancer); *United States v. Miller*, 2020 WL 1814084 (EDMI. Apr. 9, 2020) (granting compassionate release to a defendant with liver cancer, Hepatitis C and cirrhosis of the liver, among other conditions); *United States v. Edwards*, 2020 WL 1650406 (WDVA Apr. 2, 2020) (compassionate release granted to inmate with brain cancer).

In *Frandel*, supra, the court stated:

> "…This Court and numerous other courts have found that serious, active cancer is a health condition which, amid the pandemic, presents an extraordinary and compelling reason for release.
> ***
> Although defendant's recidivist, drug-driven and sometimes violent criminal history is aggravating, the Court finds that release is appropriate

under the Section 3553(a) factors, in light of defendant's health conditions during the pandemic…" *Frandel*, supra, at 12, 18.

There are also many cases where people were granted compassionate release based on the risk posed by obesity. *United States v. Davies*, 2020 U.S. Dist. LEXIS 112393 (S.D.N.Y. June 26, 2020) (man with obesity and hypertension released); *United States v. Ramirez*, No. 19 Cr. 105 (LGS), ECF Dkt. 52 (S.D.N.Y. Aug. 6, 2020) (granting release to defendant at MDC Brooklyn with diabetes, hypertension, elevated cholesterol, and obesity who had only served *18 months of a six year sentence*); *United States v. Miller*, No. 16 Cr. 666 (KMK), ECF Dkt. 321 (S.D.N.Y. Aug. 6, 2020) (granting release to defendant with hypertension, obesity, and asthma at FCI Loretto); *United States v. Zoquier-Solano*, No. 13 Cr. 772 (JPO), ECF Dkt. 45 (S.D.N.Y. Aug. 10, 2020) (granting release to defendant with hypertension, hyperlipidemia, and borderline obesity who had served seven years of ten year mandatory minimum sentence); *United States v. Shannon*, 2020 WL 3489491 (NDIL June 26, 2020)(man with obesity, hypertension and prediabetes at FCI Sandstone, where there were *no reported COVID-19 cases*); *United States v. Williams*, 2020 WL 3097615 (D Minn. June 11, 2020) (man with obesity and heart disease who was serving lengthy sentence ordered released); *United States v. Gonzalez*, 2020 WL 2766048 (SDNY May 28, 2020) (release granted to man with obesity and hypertension); *Loyd v. United States*, 2020 U.S. Dist. LEXIS 89357 (release granted to man with obesity and hypertension); *United States v. White*, 2020 U.S.

17

Dist. LEXIS 88542  (EDMI May 20, 2020) (release granted to man with obesity and hypertension); *United States v. Foreman*, 2020 U.S. Dist. LEXIS 82330  (D Conn. May 11, 2020) (release granted to man with obesity and hypertension.)

There are also cases where compassionate release has been granted based on a combination of risk factors. See, i.e. *United States v. Perkins*, 2020 U.S. Dist. LEXIS 149107[3] (DNH August 18, 2020.) The *Perkins* courts stated, at 11-12:

> "The fact that defendant has at least two co-existing high-risk conditions further increases his risk because '[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19.' Considering all these facts, the court finds that defendant's hypertension and extreme degree of obesity put him at grave risk of experiencing severe illness or death should he become infected with COVID-19."

**The COVID-19 mitigation measures taken by the Bureau of Prisons are severely inadequate as they have failed to prevent spread of the disease within federal prisons.**

Despite mitigation measures taken by the BOP, the novel coronavirus is still spreading at alarming rates through federal prisons. Outbreaks were rampant in the BOP even when spread of the virus was slowly declining nationwide. See

*Spotlighting the still sorry state of federal prisons six months into a COVID pandemic* https://sentencing.typepad.com/sentencing_law_and_policy/2020/08/spotlighting-the-still-sorry-state-of-federal-prisons-six-months-into-a-covid-pandemic.html;

---

[3] In that decision the court recommended that BOP agree to release – when BOP said no, the next day the court granted release. *United States v. Perkins*, 2020 U.S. Dist. LEXIS 150513 (DNH August 19, 2020.)

*Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, THE

NEW YORK TIMES, https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-

prisons-jails.html . The following chart (obtained from

https://www.levittandkaizer.com/) presents the daily number of confirmed cases in

BOP facilities based on data from the BOP.



In addition to the high number of cases, last month CNN reported that prison

inmates have been found to be twice as likely to die of COVID-19 than those on

the outside. https://www.cnn.com/2020/09/02/us/prison-coronavirus-clusters-

report/index.html

A recent (October, 2020) report from the Center for Health Security at the Johns Hopkins Bloomberg School for Public Health points out that the risk of infection (and complications) is very great in prisons and jails.

https://www.centerforhealthsecurity.org/our-work/publications/covid-19-and-the-us-criminal-justice-system

Even though the number of confirmed COVID-19 cases in the BOP is very high, the true number of cases is much higher as there is no system of widespread testing in the BOP. In *United States v. Gorai*, 2020 US Dist. LEXIS 72893, at *6 (DNV April 24, 2020), the court noted this lack of testing by stating:

> "First, testing inside prisons has been scant except for people who self-report symptoms-which means that statistics about the number of infections already in BOP facilities are largely meaningless. And second, the plan provides no additional protections for high-risk individuals." *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (footnote citation omitted)."

As of October 21, 2020 the BOP website states that the agency has tested 67,411 inmates and that 16, 784 inmates have tested positive. This is a 25% positivity rate - *roughly one in four inmates tested by the BOP had COVID-19.* With a positivity rate that high, it is clear that the BOP is not conducting widespread testing to find asymptomatic carriers. This is deeply troubling as the persons to display symptoms first are often the ones who become most ill from the virus.

The number of *confirmed* COVID-19 cases within the BOP is disproportionately high when compared to the number for the nation as a whole. According to the BOP's own statistics, as of October 23, 2020 there are 126,001 inmates in BOP facilities and 16,784 have been confirmed to have the virus (including some who have recovered). This means that *an astoundingly high 13.3% of BOP inmates have already tested positive for the virus*. By comparison, the US as a whole has a rate of 2482 cases per 100,000 population, meaning that 2.4% of the population has tested positive. *CDC COVID Data Tracker,* CENTERS FOR DISEASE CONTROL, https://www.cdc.gov/covid-data-tracker/#cases (trends by population factors) (accessed October 21, 2020). This massive disparity cannot simply be explained away by the rate of testing, as the positivity rate within the BOP is actually much higher than that of the nation as a whole.

The massive disparity between COVID-19 rates in the country as a whole and COVID-19 rates within the BOP is a result of the easy transmissibility of coronavirus in a prison environment. *See United States v. Rich*, 2020 WL 2949365, at *4 (D N.H. June 3, 2020) ("Many courts, including this one, have recognized that the nature of the prison environment itself enhances the likelihood that prisoners will catch this highly contagious virus."); *United States v. El-Hanafi*, 2020 WL 2538384, at *3 (S.D.N.Y. May 19, 2020) ("COVID-19 presents increased dangers in prison settings, where it is difficult to practice consistent

social distancing, to maintain strict hygiene, and to take other preventative cautions. And the problem of COVID-19 infection in jails and prisons likely runs deeper than we know. Tellingly, mass testing, in the few correctional facilities that have undertaken it, revealed vast hidden asymptomatic outbreaks.")

Given the inherent risks present in a prison environment, *vulnerable BOP inmates are placed in an impossible situation where they are unable to protect themselves from the virus*. They have no control over their living arrangements, no say over which COVID mitigation protocols should be put in place, and no ability to leave BOP custody. Their lives are in the hands of an agency that has proven itself incapable of preventing the virus from spreading among the people in its custody.

Many courts have determined that this risk of death for vulnerable inmates is one that is too extreme to take. *See United States v. McCall*, 2020 WL 2992197 at *8 (M.D. Ala. June 4, 2020) ("That interest must be balanced, however, against the grave risk that continuing to incarcerate [the defendant] at the BOP may well be a death sentence.); *United States v. El-Hanafi*, 2020 WL 2538384 at *5 (S.D.N.Y. May 19, 2020) ("Defendant's previously imposed sentence [*for terrorism convictions*] is no longer just punishment when there is a real risk that it could be transformed into a death sentence.") We respectfully ask this court to determine the same.

22

**The active presence of coronavirus at FMC Butner poses an immediate threat to Mr. Khalifi's health and life.**

FMC Butner has confirmed cases of COVID-19, posing an immediate threat of Mr. Khalifi catching the virus. (As of October 21, 2020, there are four current inmate cases, and four current staff cases.) Many courts have determined that the risk for vulnerable inmates warrants release *even in facilities with no confirmed COVID-19 cases. See United States v. Amarrah*, 2020 WL 2220008 at *6 (E.D. Mich. May 7, 2020) ("[U]nless and until [the BOP] implements a universal testing regimen, the Court gives no weight to the zero 'confirmed' COVID-19 case statistic—particularly because the BOP is housing detainees together…"); *United States v. Regas*, 2020 WL 2926457 at *3 (D. Nev. June 3, 2020) ("The fact that there are no confirmed COVID-19 cases at [the defendant's facility] is not reassuring, given that there is no facility-wide testing being done there to separate those with COVID-19 from those who do not."); *United States v. Moore*, 2020 U.S. Dist. LEXIS 89222 at *4 (D Ore. May 21, 2020) ("While there have been no identified cases of COVID-19 at [the defendant's facility] as of the date of this opinion, infection can spread with deadly speed. Some BOP facilities have seen out breaks grow into hundreds of confirmed cases in a matter of weeks."); *United States v. Schafer*, 2020 WL 2519726, at *5 (WDNY May 18, 2020) ("The Court agrees with Defendant that the recent highly publicized release of Mr. Manafort by the BOP on compassionate release grounds, from a facility with no documented

23

cases of COVID-19, suggests that the BOP recognizes the risks to a medically vulnerable inmate in even its facilities with no positive COVID-19 cases.").

In *United States v. Deleon*, 2020 U.S. Dist. LEXIS 86975 at *8, the court acknowledged that "the seriousness of defendant's offense [of conspiracy to commit sex trafficking of minors] is obvious," but said that "releasing Defendant early would not materially undermine the goals of just punishment and general deterrence, particularly when balanced against the significant risk to Defendant if he were infected." *United States v. Deleon*, at *8. The court also noted that:

> "COVID-19 presents increased risks in prison settings, where it is difficult to practice consistent social distancing, to maintain strict hygiene, and to take other preventative cautions. As of May 11, 2020, the top three clusters of COVID-19 cases in the United States—and ten of the top fifteen—were connected to prisons and jails. Tellingly, mass testing, in the few correctional facilities that have undertaken it, revealed vast hidden asymptomatic outbreaks." [*Id.* at *5]

Based on the foregoing, this Court should find that Mr. Khalifi's medical condition, along with the easy transmissibility of the virus in his prison puts him at great risk for COVID-19, and that this constitutes an extraordinary and compelling reason under 18 USC 3582(c)(1)(A).

## POINT II

### THE 18 USC 3553(a) FACTORS SUPPORT RELEASE

When considering motions for compassionate release, 18 U.S.C. § 3582(c)(1)(A) requires courts to consider the applicable factors from 18 U.S.C. §

3553(a) "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). The applicable factors from 18 U.S.C. § 3553(a) include in relevant part: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant" and "(2) the need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner…" Courts should also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). These factors weigh heavily in favor of defendant's motion for compassionate release.

Defendant's history and characteristics support his release. Defendant has very limited criminal history outside his current offense. During his nearly nine years of incarceration, he received very few (and all minor) disciplinary violations. When he was not too ill with cancer, he used his time in prison to enroll in and complete various programs, including obtaining his GED in 2014.

While the nature of the offense Defendant was convicted of is undoubtedly serious, a sentence of time served fully reflects the seriousness of the offense.

25

Several courts have recently granted compassionate release to defendants convicted in terrorism cases. *United States v. Hassan*, 2020 U.S. Dist. LEXIS 165638 (D. Minn. Sept. 10, 2020) (defendant convicted at trial of material support to Al-Shabab); *United States v. Hassoun* 2020 U.S. Dist. LEXIS 129945  (NDIL July 3, 2020) (compassionate release granted in a terrorism case to a young defendant who served less than 10 years of his 23-year sentence despite the defendant's facility having no confirmed COVID-19 cases at the time); *United States v. El-Hanafi*, 2020 WL 2538384 (S.D.N.Y. May 19, 2020) (granting compassionate release in a terrorism material support conspiracy case to a defendant who served around 10 years of his 15-year sentence); *United States v. Tajideen*, 1:17-cr-046 (DDC May, 2020) (granting compassionate release in a terrorism financing case to a defendant who served around three years of a five-year sentence).[4] The sentence that Defendant already served is sufficient to promote respect for the law and to provide just punishment for the offense. *See United States v. Hossain*, 2020 WL 3265001, at *5 (N.D.N.Y. June 8, 2020) ("Fulfilling nearly all of his original sentence supports a finding that the term of imprisonment will serve the purposes of recognizing the seriousness of the crime

---

[4] The Northern District of New York also granted compassionate release to a defendant serving 15 years for, among other things, conspiracy and material support to a foreign terrorist organization. While the defendant there had little over a month remaining of his sentence, the court blamed the BOP for this, rebuking the agency for its "dilatory conduct and changing standards for release." *United States v. Hossain*, 2020 WL 3265001, at *5 (N.D.N.Y. June 8, 2020) ("Indeed, the reason that the Defendant only has a little over a month remaining on his sentence when the Court is considering his motion has more to do with the Bureau of Prison's dilatory conduct and changing standards for release than with the seriousness of his offense.")

[of material support to a foreign terrorist organization] and providing adequate punishment.").

Amine Al-Khalifi has been rehabilitated, as displayed through his excellent prison record and the remorse he expressed for his past conduct. As a result, he has a low risk of recidivism - that and the fact that he will be deported to Morocco to be with his family shows that he will not pose a risk to the public.[5]

Consideration of providing needed medical care in the most effective manner suggests release rather than continued incarceration. This is particularly true at this time when prisoners are at great risk from the coronavirus. At home, Defendant would be able to adopt social distancing measures which he cannot adequately practice in a prison setting. In the absence of effective vaccines and treatments, social distancing is the only effective way to protect vulnerable individuals from this virus. *For this reason alone, he should be released.*

Finally, the need to avoid unwarranted sentencing disparities is in no way frustrated by a sentence reduction to time served. Given the unexpected circumstances of a global pandemic and Defendant's particular vulnerabilities, a reduction in that sentence does not create a disparity in sentencing. Even if a grant of compassionate release would lead to a sentencing disparity, that disparity would

---

[5] Mr. Khalifi has an immigration detainer and would be moved to ICE custody and then deported to Morocco.  This process could take several months.

be warranted given the special circumstances and the extended supervised release (which in this case is *life*). See *United States v. Bellamy*, 2019 US Dist. LEXIS 124219 (DMN 2019), at *19, ("[A]ny disparity resulting from a reduced sentence is not unwarranted given the special circumstances he faces in prison as a result of his health and age. Any disparity will also be mitigated by an extended period of supervised release.")

In *Zellner*, supra, the court recently stated:

> "…While Petitioner's conduct and criminal history have not changed, he is under extreme threat from a virus that may be fatal if he contracts it.
> ***
> Because Petitioner is extremely vulnerable to COVID-19, retaining him in prison simply to serve a higher percentage of his sentence at the risk of increasing his exposure to a fatal viral infection does *not* serve the 3553(A) factors and implicates an extraordinary and compelling reason for release." *Zellner*, supra, at 9, 13

As in *Zellner* and the other cases cited above, the 18 USC 3553(a) factors support a reduction of Defendant's sentence.

## **CONCLUSION**

For the foregoing reasons, Mr. Khalifi moves this Court to reduce his sentence to time served based on extraordinary and compelling reasons due to the great risk COVID-19 poses to his because of his advanced age and underlying medical conditions.

Dated: October 30, 2020

Respectfully submitted,

_____/s/_____
KATHY MANLEY
(admitted *pro hac vice*)
NY Bar Roll No. 3935467
Attorney for *Amine Khalifi*
26 Dinmore Road
Selkirk, NY 12158
(518) 635-4005 (phone and fax)
Mkathy1296@gmail.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Kathy Manley, hereby certify that the instant motion complies with LR7.1(f) & (h). A proportionally spaced typeface was used in the Word program, as follows:

Times New Roman
14 Point
Double Spaced

The total number of words in this Memorandum, including the Certificate of Compliance, is 6832.

_____/s/_____
KATHY MANLEY
(admitted *pro hac vice*)
NY Bar Roll No. 3935467
Attorney for *Amine Khalifi*
26 Dinmore Road
Selkirk, NY 12158
(518) 635-4005 (phone and fax)
Mkathy1296@gmail.com